**MAIN LINE PAVING CO., INC.,**
**Bernard A. Faggioli**

v.

**BOARD OF EDUCATION, SCHOOL DISTRICT OF PHILADELPHIA.**

Civ. A. No. 89–0821.

United States District Court,
E.D. Pennsylvania.

Nov. 29, 1989.

John Shearburn, Philadelphia, Pa., for plaintiffs.

Jackie Sparkman, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

### I. Introduction.

Main Line Paving Co., Inc. and its only stockholder Bernard A. Faggioli (collective-

ly "Main Line") have brought this suit against the Board of Education of the School District of Philadelphia (the "Board"), to raise a facial challenge to the Board's minority business enterprise set aside requirements for construction contracts. Main Line was an unsuccessful bidder on a School District contract to demolish an abandoned school building. The matter was originally filed in the Court of Common Pleas for Philadelphia County and removed to this court by the Board. Main Line's amended complaint, brought pursuant to 42 U.S.C. § 1983, avers that the Board's bidding and contracting policies violate the Equal Protection Clause of the Fourteenth Amendment. Before the court are the parties' cross motions for summary judgment, based upon a joint stipulation of facts. For the reasons which follow, we find the Board's minority set aside program to be a violation of the Equal Protection Clause. We therefore grant the motion of the plaintiff.

In its complaint Main Line alleges that the Board's affirmative action requirements and the so called Addendum No. 1 attached to the subject contract, together with the Board's standard operating procedure, are violative of the Equal Protection Clause because they create race and gender conscious classifications, assigning favored status to minorities and women in the award of construction contracts. As such, Main Line argues the set aside program fails to pass the strict scrutiny requirement for these types of benign classifications recently announced by the United States Supreme Court in *City of Richmond v. J.A. Croson Co.,* — U.S. ——, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). The Board responds that Main Line, as a mere unsuccessful bidder, has no cause of action; that since the contract has already been rebid and let, the question is moot; and that the plaintiffs have no standing to bring this action. We will first recount the stipulated facts, set out the standard for deciding motions for summary judgment, then address the arguments regarding standing

and mootness, each of which are threshold issues.

## II. Stipulated Facts.

The parties have submitted the issue on the following joint stipulation of facts:

1. This is an action by plaintiffs, Main Line Paving Co., Inc. and Bernard A. Faggioli, against the Board of Education, School District of Philadelphia, for injunctive relief, a declaratory Judgment [sic] and damages, pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, arising out of the failure of the Board ... to award Main Line ... a contract for Specification B–91 of 1988/1989 for the demolition and related work on the former R.L. Wright School.

2. Plaintiffs' prayers for temporary and permanent injunctive relief in the form of an order prohibiting the Board from opening the bids and from awarding the contract to any one other than Main Line are moot.

3. Bernard A. Faggioli is a citizen and taxpayer of the Commonwealth of Pennsylvania, and is President of Main Line.

4. Main Line ... is a Pennsylvania corporation ...

5. The School District ... is a political subdivision under 53 P.S. section 1–101 *et seq.* [sic] and 351 Pa.Code section 12.12.100 *et seq.* ... The Board ... is its policy-making body.

6. At all relevant times, the Board was acting under color of state law.

7. .... [1]

8. Main Line is a construction contractor qualified to bid on construction contracts let by the Board.

9. On or about November 22, 1988, the Board advertised for bids on Specification No. B–91 of 1988/1989 (the "contract") for the demolition and asbestos removal at the former R.L. Wright School.

---

**1.** Stipulation # 7 is a stipulation of jurisdiction. It is, of course, elementary that parties to a lawsuit may not stipulate to jurisdiction. The court finds it does have jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C. §§ 1331 and 1343; *but see* discussion infra re standing. Venue is proper pursuant to 28 U.S.C. § 1391(b).

10. Asbestos removal and demolition of the school, hauling away debris, and backfilling, all together, made up all the work called for in the contract sought by plaintiffs, except restoration of the site to grade.

11. There exist in the construction industry reports known as "Dodge Reports", which are published showing public entities that are advertising for bids on construction projects, the bid opening date and other information relevant to a contractor preparing and submitting bids on public contracts.

12. Main Line obtained a Dodge Report dated November 22, 1988 on the Board's Specification ... which showed a bid opening date of December 6, 1988.

13. Main Line subsequently obtained a Dodge Report dated November 30, 1988 ... which showed a bid opening date of December 13, 1988.

14. Main Line obtained from the Board the necessary specifications to submit a bid for the Contract, prior to December 6, 1988.

15. Prospective bidders were advised of the Board's affirmative action policy by way of a document entitled Addendum No. 1 (Revised) of the General Conditions, which was attached to and made part of the contract's specifications.

16. Addendum No. 1 had as its subject matter "School District's Policy on Subcontracting Opportunities for Minority/Women–Owned Businesses." Its provisions included the following:

### NOTICE

This is to advise you of a change in the School District of Philadelphia bidding conditions as stated below. The following paragraph is [sic][2] hereby a requirement of this bid specification and you are cautioned *THAT FAILURE TO COMPLY AT THE TIME OF BID SUBMISSION WILL LEAD TO REJECTION OF YOUR BID.*

\* \* \* \* \* \*

**2.** The "sic" inserted here was done by the parties. We interpret it as intended to indicate that

*Bids over $200,000*

Bids for construction, reconstruction, repairs, maintenance of work of any nature, including the installation of plumbing, heating and ventilation, or lighting systems in excess of $200,000 must include a minority and women-owned business subcontracting plan guaranteeing:
(a) No less than fifteen percent (15%) of the value of the award to minority-owned businesses; and
(b) No less than ten percent (10%) of the value of the award to women-owned businesses.

\* \* \* \* \* \*

For bids over $200,000, the following may also apply:
(a) Bidders which are certified minority-owned businesses may satisfy the fifteen percent (15%) MBE participation by listing themselves on the subcontracting plan. Ten percent (10%) women-owned participation is still required.
(b) Bidders which are certified women-owned businesses may satisfy the ten percent (10%) WBE participation by listing themselves on the subcontracting plan. Fifteen percent (15%) minority-owned participation is still required.

17. The specification further provides that if a bidder cannot achieve the minority and women-owned business participation, in whole or in part, the contractor must file a written request for a waiver, which lists the reasons why the contractor cannot meet that participation.

18. Since 1984, few requests for waivers have been made and few have been granted.

19. Bids for Specification B–91 of 1988/1988 were scheduled to be opened on December 6, 1988.

20. On December 6, 1988, at 11:00 a.m., Main Line learned that the bid opening date for the Contract was in fact December 6, 1988, and not December 13, 1988, as erroneously reported in the incorrect November 30, 1988 Dodge Report.

"paragraph" should have been plural.

21. Main Line's reliance on the error in the November 30, 1988 Dodge Report occurred through no fault of Main Line or the Board and was made in good faith.

22. Main Line submitted its bid of $239,000 on December 6, 1988, with a minority and women-owned business participation plan showing eight percent (8%) minority subcontractor participation.

23. At all times relevant hereto, plaintiffs intended to conform their bid to and comply with all the specifications of contract B–91 of 1988/1989, including Addendum No. 1, if possible.

24. Plaintiff Faggioli contacted a minority contractor and representatives of two women-owned businesses to ascertain their interest in participating in contract B–91 of 1988/1989, and to obtain bids from them for portions of the work involved in the contract.

25. Because of the conflicting Dodge Reports, Main Line was unable to confirm preliminary negotiations with its potential minority and women-owned subcontractors by bid opening on December 6, 1988.

26. At trial, Faggioli would testify that he submitted with his bid on December 6, 1988, a written request for waiver of the remaining requirements of Addendum No. 1 until Main Line could obtain the Board's goals.[3] On December 14, 1988, Main Line submitted a letter to the Board purportedly withdrawing its request for a waiver, because it had attained the Board's required minority and women-owned business participation. On that date, Main Line submitted to the Board a Bidder's Subcontracting Plan showing participation of a minority-owned subcontractor for fifteen percent (15%) of Main Line's bid price and participation of a women-owned subcontractor for thirty percent (30%) of Main Line's bid price.

27. At trial, witnesses testifying on behalf on the Board would deny that plaintiffs requested a waiver, but would acknowledge receipt of Main Line's December 14, 1988 letter.

28. Main Line's bid was for $239,000.00, the lowest bid of three submitted by the contractors bidding.

28a. Plaintiff Faggioli had not decided what portion of the work Main Line would perform over that required by Addendum No. 1, or whether he would subcontract out all of the work on the contract. His decision whether to proceed one way or the other was a business decision based on which action would prove more profitable to Main Line.

29. Main Line's bid of $239,000 originally anticipated that Main Line would subcontract to North American Contracting Co. ("North American"), a minority-owned firm, the asbestos removal portion of the contract and perform the remainder of the work itself.

30. Main Line is a certified asbestos removal contractor and has itself done asbestos removal work.

31. North American quoted Main Line a price for asbestos removal which Main Line considered within the range of fair and reasonable, but on the low side.

32. Subsequent to its submission of the $239,000 bid, Main Line received confirmation of a price by Delaware Valley Wrecking Company ("Delaware Valley"), a women-owned firm, for practically the entire job (excepting only asbestos removal and paving the site, plus other costs such as insurance).

33. Delaware Valley proposed to plaintiffs to obtain a demolition permit, demolish the building, haul away debris and backfill to within 6″ of grade for $72,500.

34. Main Line could not do all the work that Delaware Valley proposed to do for $72,500, a price Faggioli considered low.

35. Upon receipt of Delaware Valley's bid, plaintiff Faggioli decided to "broker" contract B–91 of 1988/1989, i.e., to subcontract the entire contract out, if it were awarded to Main Line.

36. Notwithstanding the parties disagreement over whether Main Line sub-

**3.** We note the distinction between the parties' use of the term "goal" to describe Addendum No. 1's requirements and the plan's own term of "guarentee". See Stipulation No. 16.

mitted a request for a waiver, Main Line's bid otherwise complied with the School District's subcontracting requirements.

37. On January 5, 1989, Main Line and Faggioli filed suit in *Main Line Paving Co. v. Board of Education,* January Term, 1989, No. 622 (C.C.P. Phila), seeking a declaratory judgment that Main Line was the lowest responsible bidder on Specification No. B–91 of 1988/1989 and injunctive relief prohibiting the award of the Contract for Specification No. B–91 of 1988/1989 to anyone other than Main Line.

38. After a full hearing on January 8, 1989, the Court of Common Pleas issued a preliminary injunction prohibiting the Board from awarding contract B–91 of 1988/1989 to anyone other than Main Line.

39. On January 9, 1989, the Board rejected all bids for contract B–91 of 1988/1989.

40. On January 13, 1989, the School District solicited rebids on Specification No. B–91 of 1988/1989, as Specification No. B–107 of 1988/1989.

41. Specification No. B–107 of 1988/1989 is the same project as Specification No. B–91 of 1988/1989, and included the same terms and conditions, including Addendum No. 1.

42. Upon opening of the new bids, Main Line's rebid was found to rank fourth of six bids submitted for the readvertised contract. Main Line's second bid in the amount of $229,000 included a subcontracting plan showing intent to subcontract 15% of the contract value to a minority owned business, and 30% of the contract value to a woman-owned business.

43. The Board awarded contract B–107 of 1988/1989 to the lowest bidder on the rebid, Kimmens Environmental Services Company, which bidder complied with all bid specifications. Kimmens' bid was $184,500.

44. Main Line did not bid on a School District contract prior to December 1988.

45. Main Line has not bid on a School District contract since January 1989.

46. Main Line expected to earn a higher profit by subcontracting out the work on the contract than it could earn by performing the work itself.

47. Main Line expected to realize from its $239,000 bid for contract B–91 of 1988/1989, through subcontracting the work out, a profit of $111,600.

48. On June 26, 1989, the Board adopted Resolution M–24, which made compliance with the economic affirmative action policy of December 19, 1983, a matter of bidder responsibility rather than bidder responsiveness.

49. Beginning in the early 1970's, the School District became aware that few of its contracts were being awarded to minority and women-owned businesses.

50. Minority business owners complained of being unable to obtain adequate, timely and correct information about School District contracting opportunities and contracting procedures.

51. Minority business owners further complained of being unable to obtain subcontracts from non-minority prime contractors.

52. Investigation of minority business owners complaints by top School District personnel revealed instances where minority low bidders, as prime contractors, were denied contracts for pretextual reasons.

53. No disciplinary action was taken against offending School District employees.

54. All School District contracts valued in excess of $4,000 are advertised pursuant to the Public School Code, 24 P.S. section 7–751 [sic].

55. In 1983 and 1984, the School District conducted meetings at which bonding, financing, slow payment by the School District and the School District's contracting procedures were discussed.

56. In addition, the School District follows a practice of soliciting bids from contractors with whom it has done business in the past or who are known to be engaged in the type of work involved.

57. The School District maintains lists of contractors from whom it might solicit

bids according to the category of product or service needed.

58. Prior to 1984, there were very few minority and women-owned businesses on the bidders' lists.

59. The majority of contracts issued by the School District each year are not advertised and require no bonding. Bidders for these contracts are obtained from the bidders' lists.

60. As a result of its reliance on the lists, the Board found that it was doing business with the same contractors over and over again.

61. Prior to 1984, School District outreach effort to the minority business community were [sic] sporadic and short lived. Minority business owners voiced concern that the School District was only paying lip service to its legal obligation of equal opportunity since they still met indifference, rudeness, and hostility when they approached School District employees about contracting opportunities.

63.[4] The Board in response to continue [sic] complaints by minorities of being shut out from contracting opportunities tried set asides for a brief period in the 1970's. A small number of contracts valued at less than $500.00 for such services as minor electric, plumbing, and other repair of school facilities, were reserved for bid by minority contractors only. Minority participation rates rose for a time after initiation of this program, and then tapered off. Black contractors complained that they were not notified or called for price quotations even on projects supposedly set aside for them.

64. Failure of the trial set aside program was attributable in part to the attitude of School District employees who were more interested in maintaining established ways of operating than in following the directives of top School District officials to open up the system to newcomers.

65. The Board was concerned in adopting an affirmative option policy that minority and women owned business [sic] have a fair and equitable opportunity to participate in School District contracts.

66. The Board was aware of the hearings held before the Philadelphia City Council in 1981 prior to the City's adoption of an affirmative action program.

67. Investigation showed that only about one half of one percent of School District contracts were awarded to minority contractors between 1982 and 1983.

68. The Board was concerned that the low percentage of School District contracts awarded to minority and female owned businesses was the result of ongoing School District practices and procedures which limited access to minorities and women, and which had proved recalcitrant to change.

69. Among the practices which had the effect of limiting access to contracting opportunities was the practice of restrictively drafting specifications so that only certain contractors were qualified to bid and demanding bonding and insurance grossly in excess of the needs of the School District for protection.

70. The ability to get bonding for School District contracts is a function of the financial strength of the contractor. A weak financial posture of a white male contractor would impact on the ability of that contractor to obtain bonding the same as a weak financial posture would impact on a minority of [sic] women-owned contractor to get bonding.

71. The Board has not in Addendum No. 1 required that any specific number of School District contracts or any specific percentage of available contracting dollars in any year go to minority or female businesses.

### III. Discussion.

a. Summary judgment standard.

In considering these cross-motions for summary judgment, we must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact, and whether the moving party is entitled to a judgment as a matter of law.

---

**4.** Number 62 was omitted from the parties numeration of the stipulations.

Fed.R.Civ.P. 56(c). *Arnold Pontiac–GMC, Inc. v. General Motors Corporation,* 786 F.2d 564, 568 (3d Cir.1986); *Fragale & Sons Beverage Co. v. Dill,* 760 F.2d 469, 472 (3d Cir.1985); *Wolk v. Saks Fifth Avenue, Inc.,* 728 F.2d 221, 224 (3d Cir.1984); *First Jersey National Bank v. Dome Petroleum Limited,* 723 F.2d 335, 338 (3d Cir.1983). The movant has the burden of demonstrating that there are no genuine issues of material fact and all reasonable inferences from the record must be drawn in favor of the non-moving party. *Gans v. Mundy,* 762 F.2d 338, 340 (3d Cir.1985); *United States v. Athlone Industries, Inc.,* 746 F.2d 977, 981–82 (3d Cir.1984); *Small v. Seldows Stationary,* 617 F.2d 992, 994 (3d Cir.1980). As the parties have stipulated to the facts upon which these motions will be decided, we find the case is ripe for summary judgment.

b. Plaintiffs' standing to sue.

The Board avers that the plaintiffs lack standing to seek declaratory relief, arguing that they have suffered no threatened injury which may thereby be cured. Arguing that it is settled law in Pennsylvania that a disappointed bidder is not ordinarily entitled to an order directing award of a public contract to itself, the Board avers that, because Main Line has not sought to bid on any other School District contracts, even if we were to find an illegality the plaintiffs could not personally benefit. Therefore, the argument goes, the plaintiffs have no injury distinct to themselves which declaratory relief may ameliorate. In their amended complaint, the plaintiffs aver that their claims arise out of the Board's bid solicitation process for a specific project, for which the plaintiffs actually submitted a bid. They argue they have suffered actual injury when the Board determined them to be a non-responsive bidder because of the requirement of meeting the set asides, and that the injury may be traced to the challenged action. They conclude by arguing that only a declaration, holding that the set aside process violates the Equal Protection Clause, can make them whole.

We begin our discussion of the standing issue in this case by acknowledging that this is not the first time that set asides like those at issue *sub judice* have been challenged. In *Rocks v. City of Philadelphia,* 868 F.2d 644 (3d Cir.1989), five plaintiffs, none of whom were involved in the construction industry, failed in their attempt to demonstrate standing to sue in their capacities as municipal taxpayers. While determining that the plaintiffs established the pure requirements of Article III standing, the United States Court of Appeals for the Third Circuit agreed with the district court that the prudential limitations on the exercise of federal jurisdiction militated against permitting those plaintiffs to assert the rights of non-minority construction contractors. As the plaintiffs *sub judice* are involved in the construction industry, we find their lawsuit asserts their own legal interests and does not rely upon the legal rights of third parties. The plaintiffs *sub judice,* therefore, provide the element missing in *Rocks.*

■ In order to have standing to sue, plaintiffs must assert a personal stake in the outcome of the controversy, one which demonstrates that they have suffered an injury in fact. *Warth v. Seldon,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975). Second, the plaintiff must show that their injury is causally linked to the putatively unconstitutional conduct of the defendant. *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). These two factors have been characterized as the "irreducible minimum" required by Article III. *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

The injury in fact component serves a separation of powers concern central to the case or controversy language of Article III by limiting judicial power to those disputes "thought capable of resolution through the judicial process". *Flast v. Cohen,* 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968). It serves "as at least a rough attempt to put the [dispute] in the hands of those who have a direct stake in the outcome," *Sierra Club v. Morton,* 405 U.S.

727, 740, 92 S.Ct. 1361, 1369, 31 L.Ed.2d 636 (1972), and provide the court with "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions". *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

Additionally, plaintiffs must demonstrate a sufficient causal connection between the challenged activity and the alleged personal harm. The usual formulation of the causation requirement is that the plaintiff must show that the injury "fairly can be traced to the challenged action of the defendant." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976). We find the plaintiffs meet both requirements of pure Article III standing.

■ Plaintiffs satisfy the injury in fact requirement. Had there been no set aside policy in effect when Bid Specification No. B–91 of 1988/1989 was advertised and let, Main Line would have been the successful bidder on the project. Its bid was the lowest of the three submitted. Stipulation No. 28. There is no evidence that Main Line's bid was unresponsive in any other aspect. Main Line would have earned a profit had it received the contract. Stipulation No. 47. As the Board rejected all bids and readvertised the work as a new Bid Specification, for which the plaintiffs were not the low bidder, Main Line has suffered a putative monetary injury in its lost profit on the original Bid Specification.

■ In order to actualize its putative injury, Main Line must demonstrate that the Board's act of rejecting the original bids was done for an improper purpose. Declaratory relief, we therefore find, is a necessary element of the plaintiffs' cause of action. Whether declaratory relief should be granted in an appropriate case is committed to the sound discretion of the trial court. *Bituminous Coal Operator's Ass'n., Inc. v. International Union, UMW,* 585 F.2d 586, 595–596 (3d Cir.1978). In determining the appropriateness of declaratory relief, the court must consider whether it will resolve an uncertainty giving rise to a controversy, the convenience of the parties, the public interest and the availability of other remedies. *Id.* at 596–597. The uncertainty giving rise to this controversy is the continued constitutionality of the Board's set aside policy in light of the *Croson* case. Adjudicating the request for declaratory relief will resolve this uncertainty, as well as serve the convenience of the parties through its issue preclusion effect. We find the public interest will also be served because of this issue's important relationship to the cost of financing public construction projects. Finally, as we have stated, the declaratory relief sought is a necessary element of the cause of action.

Respecting the causation requirement of Article III standing, we find the plaintiffs satisfy this requirement as well. Again, Main Line's bid was the lowest submitted; there was no other cause for its rejection by the Board other than Main Line's failure to meet the allegedly unconstitutional set aside requirements. Causation has, therefore, been demonstrated.

We come then to the prudential limitations associated with the concept of standing, which kept the plaintiffs out of court in *Rocks.* Succinctly stated by the Supreme Court in *Warth* and *Valley Forge,* and quoted by the Court of Appeals in *Rocks,*

> Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing. Thus, the Court has held that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."

*Rocks* at 648, quoting *Valley Forge,* 454 U.S. at 474, 102 S.Ct. at 759, and *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205. The District Court in *Rocks* refused to permit to plaintiffs to assert the rights of non-minority contractors because, merely as taxpayers, they shared no special relationship with them. *Rocks* at 648. The Court of Appeals agreed holding the plaintiffs stated only a generalized grievance. *Id.* at 649. We find, however, that the plaintiffs *sub judice* state an individualized grievance.

Main Line brings its claims not only as a taxpayer interested in constitutional governance, but as a disappointed bidder that suffered injury because of the Board's allegedly discriminatory classifications. Faggioli, as its president, also has a clear financial interest in the outcome of this litigation. As such, they seek to assert their own legal rights and interests, not those of third parties or those shared in substantial measure by all or a large class of citizens. The legal challenge is to specific actions of the defendant causing specific results to these plaintiffs.

We therefore conclude that Main Line has standing to assert its claim for declaratory relief.

c. Are the plaintiffs' claims moot?

■ It has been stipulated that the plaintiffs' claim for injunctive relief is moot since the actions sought to be enjoined have irrevocably occurred. Stipulation No. 2. The Board argues further that the balance of the claims are also now moot since, in the absence of any continued prospective contractual relationship, the plaintiffs lack a legally cognizable interest in the outcome of the dispute. Subsumed in this argument is the Board's assertion that the "capable of repetition, yet evading review" doctrine cannot apply since Main Line has bid on no other contracts and that Main Line, as a disappointed public bidder, has no cause of action for breach of contract. As we find that an actual controversy does exist, we hold that the claims for declaratory and monetary relief are not moot.

As stated by the Court of Appeals, speaking through Judge Higginbotham,

It is axiomatic in our federal jurisprudence that a case must present a live controversy throughout the entire course of the litigation. This principle, predicated upon Article III of our Constitution, as well as upon prudential concerns, assures that throughout all stages of the litigation, a case retains both a concrete adversariness between the parties and remediability by the court.

*Jersey Central Power v. State of New Jersey,* 772 F.2d 35 (3d Cir.1985). In *Jersey Central,* the court had occasion to address several of the legal points also at issue *sub judice.*

The court determined that the availability of declaratory relief will not always satisfy the constitutional requirement that the case or controversy be susceptible to judicial resolution; the concreteness of the factual situation and the adverseness of the parties must remain considerations. *Id.* at 40–41. A declaratory judgment, the court held, is available only so long as there is an actual controversy among the parties. The court further determined that the availability of damages or other monetary relief, on the other hand, almost always avoids mootness; that damages should be denied on the merits, not on the grounds of mootness. *Id.* at 41. We begin our analysis of the question of mootness then, with a determination of whether an actual controversy exists and whether monetary damages are available. These are interrelated questions.

The Board's argument that no actual controversy exists is premised upon their argument that money damages are not available. In other words, the Board contends that: 1). a disappointed bidder has no cause of action and therefore no cause for monetary relief; 2). as monetary relief is not available, there is no actual controversy upon which to ground a demand for declaratory relief. Our fault with the Board's argument is not with its logic, but with its premise.

Main Line's amended complaint asserts claims pursuant to 42 U.S.C. § 1983. § 1983 provides a cause of action against "[e]very person who, under color of [state law] subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...." As such, it has been held that § 1983 gives rise to a species of tort liability. *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976). As the Supreme Court recently stated:

We have repeatedly noted that 42 U.S.C. § 1983 creates a " 'species of tort liabili-

ty' in favor of persons who are deprived of 'rights, privileges or immunities secured' " to them by the Constitution.... Accordingly, when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to the principles derived from the common law of torts. *Memphis Community School District v. Statchura,* 477 U.S. 299, 305–306, 106 S.Ct. 2537, 2541–42, 91 L.Ed.2d 249 (1985) (citations and note omitted). When the plaintiffs' claims are properly viewed as alleging tortious, rather than contractual injuries, it becomes clear that monetary relief is available and an actual controversy exists between the parties.

We therefore hold that both monetary, and by necessary implication, declaratory relief are available to the plaintiffs.[5]

d. The merits of the plaintiffs' claims.

As a sister federal district court recently had occasion to say, the issues of the wisdom and validity of affirmative action programs based on benign racial and gender classifications have engendered controversy and passion; the United States Supreme Court has not spoken unequivocally on these questions. *Milwaukee County Pavers Ass'n v. Fiedler,* 707 F.Supp. 1016, 1021 (W.D.Wis.1989). In three major cases over the past dozen years, the Court was unable to reach a majority consensus about the proper standard of review applicable to benign racial classifications, the intentions and factual findings needed to support such classifications, or the permissible scope of affirmative action plans. See, *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *University of California Regents v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). The court's recent decision in *City of Richmond v. J.A. Croson,* supra, answers some of these questions and provides the analysis of the plaintiffs' claims.

In *Croson,* a majority of the Court did agree on the requirements for the constitutionality of a state or local affirmative action program. The case concerned Richmond's Minority Business Utilization Plan, which required prime contractors awarded city construction contracts to subcontract at least thirty percent of the dollar amount of each contract to one or more minority business enterprises. The plurality was of the opinion that a racial preference, at least when implemented by a state or local government, is subject to strict scrutiny review under the Equal Protection Clause. *Croson* at ——, 109 S.Ct. at 720–723. See also Scalia, J., concurring, 109 S.Ct. at 735; *Shurberg Broadcasting of Hartford, Inc. v. F.C.C.,* 876 F.2d 902, 912 (D.C.Cir.1989). The Court held the Richmond plan was not supported by a sufficient factual predicate for remedial action. The Court found the city council's evidence deficient, because "a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Croson,* 109 S.Ct. at 723–724. The Richmond plan also failed the test of narrow tailoring because there had been no "consideration of the use of race-neutral means to increase minority business participation in city contracting", *Croson,* 109 S.Ct. at 727, nor did the plan provide for an "inquiry into whether or not the particular MBE seeking a racial preference ha[d] suffered from the effects of past discrimination...." *Croson,* 109 S.Ct. at 729–730.

*Shurberg,* cited above, was decided by the United States Court of Appeals for the District of Columbia Circuit shortly after *Croson.* The court engaged in an extended study of the line of cases from *Bakke* to *Croson.* Its analysis is helpful and we quote it at length:

Some general propositions may be gleaned from these four cases. Governmentally-imposed minority preferences are constitutionally permissible under certain limited circumstances, but they

---

5. Given our framing of the issue, discussion of the Board's argument that disappointed bidders on public contract have no cause of action on a contract theory is unnecessary.

may not be based on the desirability *per se* of achieving racial balance or proportional representation of minorities in selected institutions. The Court has recognized that the objective of remedying past discrimination may justify the use of minority preferences, *see Fullilove*, 448 U.S. at 475, 100 S.Ct. at 2773, and at least one Justice has viewed promoting diversity in an educational context as a second compelling state interest. *See Bakke*, 438 U.S. at 311–15, 98 S.Ct. at 2759–61 (opinion of Powell, J.).

The nature of the evidence required to establish the existence of prior discrimination varies with the authority of the governmental body imposing the remedial preference. *See Fullilove*, 448 U.S. at 515 n. 14, 100 S.Ct. at 2793 n. 14 (Powell, J., concurring). Congress is clearly the institution with the most latitude to make findings of discrimination and authorize remedies on the basis of the evidence before it. *See Croson* at ——, 109 S.Ct. at 719–20; *Fullilove*, 448 U.S. at 472, 482, 100 S.Ct. at 2785–87 (Powell, J., concurring). A state or local government must have stronger evidence of discrimination before it can employ racial classifications, *Croson* at ——, 109 S.Ct. at 720, and that evidence must 'approach[ ] a prima facie case of a constitutional or statutory violation.' *Id.* at ——, 109 S.Ct. at 723–24.

Assuming the factual predicate for remedial action by any governmental body has been established, a reviewing court must still ensure that the use of race is narrowly tailored to the remedial purpose. *Croson* at ——, 109 S.Ct. at 728; *Wygant*, 476 U.S. at 274, 106 S.Ct. at 1847. Most important, a racial preference plan must allow for case-by-case consideration of applicants to ensure that each minority has in fact suffered from the effects of past discrimination. *See Croson* at ——, 109 S.Ct. at 719, 727–30; *Fullilove*, 448 U.S. at 486–87, 100 S.Ct. at 2779. The preference also must be structured in a way that minimizes the burden on nonminorities, so that innocent people are not asked to shoulder an undue share of the cost of remedying dis-

crimination. *Wygant*, 476 U.S. at 282–84, 106 S.Ct. at 1851–52; *Fullilove*, 448 U.S. at 514–15, 100 S.Ct. at 2793 (Powell, J., concurring). When a remedy is limited and properly tailored, some sharing of the burden by innocent third parties may be unavoidable and does not render a remedial program unconstitutional. *See Fullilove*, 448 U.S. at 515, 100 S.Ct. at 2793 (Powell, J., concurring); *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 774–75, 96 S.Ct. 1251, 1269, 47 L.Ed.2d 444 (1976). But the government's compelling need to employ a race-conscious remedy must outweigh the unfairness to innocent nonminorities. *See Fullilove*, 448 U.S. at 515, 100 S.Ct. at 2793 (Powell, J., concurring).

*Shurberg* at 912–13 (note omitted). With this legal framework in place we turn to the stipulated facts to determine the ultimate issue.

*1. Do the stipulated facts provide a sufficient predicate to support the race-conscious remedial action taken?*

Relevant to this determination are those stipulations which concern not the contract at issue *sub judice*, but those that concern the Board's contracting history and its causes for implementing the program. We begin at Stipulation No. 49. Up to the early 1970's, few School District contract were let to minority or women-owned businesses. The District received complaints that information about contracting opportunities was not forthcoming to minorities. Neither were opportunities to sub-contract. The School District determined that its own employees were in great part responsible, denying minority low bidders contracts on pretextual reasons and preferring to deal with contractors with whom they had had prior relationships.

Further to blame was the School District's policy of maintaining contractor lists. Bids for projects were solicited from contractors on the list. There were few minority or women-owned businesses on these lists prior to 1984. As a result the Board let its contracts to a small group of repeat bidders to the exclusion of others. After 1984, outreach efforts to minority contractors were sporadic. The School Dis-

trict's trial set aside programs were being undermined by the attitudes of its employees, who were more interested in maintaining established ways of operating than in following the directives of policy makers to open the system.

After the City Council of Philadelphia held a series of hearings, investigation showed that only one half of one percent of School District contracts were awarded to minority contractors between 1982 and 1983. The Board was also of the belief that its procedures had the effect of limiting access. It believed that contract specifications were being drawn too restrictively so that only certain contractors qualified to bid on them. Further, its bonding and insurance requirements were grossly in excess of the needs of the District.

Whatever the ambiguities of *Croson's* plurality opinion and the various concurrences, it is clear that a majority of the Court believes that state and local laws and policies employing racial and ethnic classifications must be supported by specific evidence of discrimination against those aided by the law or policy. In Part IIIB of the plurality opinion, which gained the support of a majority of the Court, Justice O'Connor undertakes a searching review of the factual findings underlying the City of Richmond's determination that its plan was necessary to remedy past effects of discrimination against minorities in the area of construction contracting. *Croson* at ——, 109 S.Ct. at 723–28. While not necessarily applying the standard of strict scrutiny she suggests in Part IIIA, joined by only a plurality, Justice O'Connor engages in a rigorous inquiry into the factual predicate for remedial legislation. The Court looked to specific, documented evidence that particular minorities were discriminated against in the construction industry in Richmond, finding that none of the district court's findings were sufficient to establish that remedial legislation was necessary.

■ We find the evidence *sub judice* is likewise insufficient to establish that the chosen remedial legislation was necessary. What is primarily striking about the stipu-

lation, in its overall tenor, is that the School District sees itself, and not the structure of the local construction industry, as the prime source of the discrimination it sought to cure by implementing the program of set asides. Equally important is that the stipulation contains nothing of the factual predicate upon which the Supreme Court has required a benign system of classifications to be based, i.e., specific evidence of current discrimination against those aided by the policy.

There is no evidence before the court that the Board's program is intended to specifically benefit those minority or women-owned businesses that it believes were the identified victims of its employees' denial of contracts on pretextual bases or their attitudes or reluctance to open the contracting system. It is just the type of "generalized assertions" of discrimination the Board makes here that the Court in *Croson* rejected. *Id.* at ——, 109 S.Ct. at 725. Further, without specific evidence, we must heed the holding of the Court in *Croson,* that little weight can be given to the Board's description of its program as remedial. We therefore find the Board has failed to demonstrate the factual predicate upon which it may justify the requirements of Addendum No. 1.

*2. Is Addendum No. 1 narrowly tailored to remedy prior racial discrimination?*

Although the Board's set aside policy must fail under the above criteria, for the sake of completeness we will address also the requirement of narrow tailoring. It is the court's opinion that Addendum No. 1 fails this prong of the test as well.

■ Assuming the factual predicate for the Board's remedial action was established, to pass constitutional scrutiny, Addendum No. 1 must also have been narrowly tailored to the remedial purpose. *Croson* at ——, 109 S.Ct. at 728; *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847. Most important, a racial preference plan must allow for case-by-case consideration of applicants to ensure that each beneficiary of the plan has in fact been the victim of past discrimination. *Shurberg,* 876 F.2d at 912, *citing Croson* at ——, ———––——, 109 S.Ct. at 719, 727–30; *Fullilove,* 448 U.S. at 486–87,

100 S.Ct. at 2779. The preference also must be structured in a way that minimizes the burden on nonminorities, so that innocent people are not asked to shoulder an undue share of the cost of remedying discrimination. *Shurberg,* 876 F.2d at 912–13, *citing Wygant,* 476 U.S. at 282–84, 106 S.Ct. at 1851–52; *Fullilove* 448 U.S. at 514–15, 100 S.Ct. at 2793 (Powell J. concurring). When a remedy is limited and properly tailored, some sharing of the burden by innocent third parties may be unavoidable and does not render a remedial program unconstitutional. But the government's compelling need to employ a race-conscious remedy must outweigh the unfairness to innocent nonminorities. *Shurberg,* 876 F.2d at 913.

In the case *sub judice,* there is nothing in the record to indicate that the Board considered the use of race-neutral means to increase minority business participation in its contracting opportunities before opting for race-conscious alternatives. Its only prior attempts also involved race-conscious means. Clearly, less intrusive race-neutral means are available. Elimination of bidder lists and better oversight of employees to eliminate recalcitrance and to insure that the Board's wishes of broadening contracting opportunities are fulfilled are two which come quickly to mind. As the Board saw itself was the cause of the problem, rather than the structure of the local construction industry, it was in a position to remedy the problem with measures designed to minimize the burdens to nonminorities.

Further, we note that the Board's program contains no provisions to identify those who were victims of past discrimination and to limit the program's benefits to them. Neither has the Board attempted to demonstrate that its compelling need for Addendum No. 1 outweighs the unfairness to innocent nonminorities. Finally, the fact that few waivers were ever granted and

that the plan provides that prime contractors must guarantee specific minimum levels of minority and female participation is highly indicative that the Board has not merely ascribed goals, but has established an impermissible system of quotas.

We therefore find that Addendum No. 1 is not narrowly tailored to remedy past racial discrimination.

*3. Are the gender-based set asides contained in Addendum No. 1 constitutional?*

*Croson,* it must be remembered dealt only with classifications based upon race and ethnicity, classifications which if established invidiously were already subjected to strict scrutiny analysis. The set aside program we deal with *sub judice* contains not only race-conscious classifications, but gender-conscious classifications as well. Because invidious gender based classifications were not the focus of the reconstruction amendments, they have been historically examined under only an intermediate level of scrutiny. *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). This analysis has been stated succinctly as requiring the state to demonstrate an important governmental interest and means which bear a fair and substantial relation to the objective. *Id.* at 211, 97 S.Ct. at 464 (Powell, J., concurring). Our research has discovered no cases addressing the issue of what level of scrutiny to apply, post-*Croson,* to gender-based remedial classifications. The issue is apparently one of first impression.[6]

We believe that the proper level of scrutiny to apply to the remedial gender-conscious classifications of the Board's set aside program is that announced by *Reed* and *Craig* and consistently adhered to by the Court. The appropriate standard to be applied by the courts in equal protection analysis is determined by reference to the

---

**6.** The United States Court of Appeals for the Ninth Circuit did have occasion to touch upon *Croson* in a gender discrimination case but did not reach the issue *sub judice.* In *Clark v. Arizona Interscholastic Association,* 886 F.2d 1191 (9th Cir.1989), the court rejected the plaintiff's attempt to apply strict scrutiny to the alleged gender-based discrimination before it on the basis of the Supreme Court's holding in *Croson,* reiterating that *Craig* established the appropriate standard of review. The court, however, was dealing with allegedly invidious discrimination and not remedial classifications.

nature of the right affected by the classification and the identity of the class burdened by the classification. *Medora v. Calutti,* 602 F.2d 1149, 1154 (3d Cir.1979). Gender has never been held to require the highest level of scrutiny reserved, before *Croson* at least, for invidious classifications based upon race, national origin or ethnicity. We do not read the various opinions in *Croson,* extending heightened scrutiny to remedial classifications based upon these same impermissible purposes, as working an alteration to this analysis.

Indeed, the philosophy underlying the plurality opinion in *Croson* is that equal protection analysis should be applied consistently to all classifications based upon the same improper consideration, irrespective of benign or malignant motive. Were we to opt to be facially consistent and apply strict scrutiny to the Board's gender-based classifications, because they are remedial like the classifications in *Croson,* rather than applying middle level scrutiny because they are based on gender, we would be defeating this philosophy. For this reason, we find that intermediate level scrutiny is the appropriate analysis to apply to remedial classifications based on gender.

As has been noted by the United States Court of Appeals for the Ninth Circuit, laws that afford special privileges to women raise some of the most difficult and sensitive questions about the permissible bounds of governmental action within the confines of the Equal Protection Clause. *Associated General Contractors of California v. City and County of San Francisco,* 813 F.2d 922, 939 (9th Cir.1987). Intermediate review, it stated, provides "relatively little guidance in individual cases". *Id., quoting* Note, *Madisonian Interpretation of the Equal Protection Doctrine,* 91 Yale L.J. 1403, 1412 (1982). In *Associated General Contractors,* the court was likewise faced with remedial classification based upon gender, as well as race. Opting also, pre-*Croson,* to apply mid-level scrutiny to these remedial classifications, the court warned that "a thin line divides governmental actions that help correct the effects of invidious discrimination from those that reinforce the harmful notion that women need help because they can't make it on their own." *Id.* at 940. It was in part for this reason that the court believed the Supreme Court has required an "exceedingly persuasive justification" for classifications based on gender. *Id., citing Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982); *Kirchberg v. Feenstra,* 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981); *Personnel Admin. of Mass. v. Feeney,* 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979). The court found that helping women overcome the adverse effects of discrimination was a sufficiently important objective to justify the limited use of gender-based remedial classifications. However, the court determined that the scope of the remedy was over broad; that the defendant had not demonstrated that women were disadvantaged in each of the many industries covered by the subject ordinance. *Id.* at 941.

In the matter *sub judice,* we agree that the Board states a sufficiently important objective in the desire to overcome past discrimination against women in the field of construction contracting. Our problem with the set aside policy, however, is that the Board has demonstrated scant evidence that it is fairly and substantially related to this objective. While the joint stipulation reveals that significant barriers were faced by minorities attempting to penetrate the fold of contractors favored by the Board and its employees, the only mention of women is the fact that there were very few contracts awarded to them. The stipulation contains nothing to detail the cause of this disparity, or to say for certain that it was caused by gender discrimination, rather than other conditions in the general economy. The only statistical evidence presented is that in 1982 and 1983 only one half of one percent of Board contracts went to minority contractors. There is no similar evidence for women contractors, either for that time period or later.

The only statement contained in the stipulation which could be interpreted as demonstrating the required justification for the

gender-based remedial classifications is No. 68. It states that the Board was concerned that ongoing School District practices had the result of limiting access to both minorities and women. We find this to be insufficient to demonstrate an "exceedingly persuasive justification" required for the Board's gender-based set aside policy. While the Board's concern is certainly admirable, it no evidence that women "actually suffer[ed] a disadvantage related to the classification". *Hogan*, 458 U.S. at 728, 102 S.Ct. at 3338. On the evidence presented, therefore, we cannot say that the Board's gender-based remedial classifications are substantially related to its important goal of overcoming past discrimination in the field of construction contracting.

### e. Remedies.

Having determined that the plaintiff's facial challenge to the Board's set aside program has merit, our next inquiry is the appropriate remedy to award them. In their complaint, the plaintiffs seek a declaration that the provisions of Addendum No. 1 are unconstitutional as a violation of the Equal Protection Clause. Having already discussed the appropriateness of declaratory relief infra, and having found that Addendum No. 1 does not comport with the Supreme Court's requirements for race-conscious or gender-conscious classifications, declaratory relief will be granted. Still to be discussed, however, is the plaintiffs' request for money damages and the award of attorney's fees and costs.

### 1. Money damages, fees and costs.

█ The Stipulation provides that of Main Line's bid of $239,000, it expected to realize a profit of $111,600, after paying the subcontractors who would actually perform most if not all of the work on the R.L. Wright School. Main Line argues that this amount is its measure of damage since it reflects its lost profit caused by the Board's rejection of its bid for improper purposes. The Board responds that Main Line's calculation is conjectural and is not supported by sufficient evidence. It adds that in his deposition, plaintiff Faggioli failed to identify the exact method by which he calculated his figures, stating

that he would include as his overhead "whatever he felt". The Board also argues that Main Line was under an obligation to mitigate its damages and, therefore, the amounts it earned on other jobs must be deducted from its alleged damages herein. We find the Board's arguments to be without merit.

Although when addressing the standing issue, the Board argued that only a contractual cause of action theory should apply to the instant matter, in its response to the plaintiffs' damage argument in its motion for summary judgment, the Board apparently concedes that tort damages are the appropriate measure of relief. Defendant's Response to Plaintiffs' Motion for Summary Judgment at 13, *citing Memphis Community School District v. Stachura*, supra, 477 U.S. at 305, 106 S.Ct. at 2541 (1985). We are, therefore, initially puzzled by its argument that mitigation is in issue. The Pennsylvania Supreme Court determined long ago that the application of the doctrine of mitigation is based upon the existence of a contractual relationship. *Vega v. Burgettstown Borough*, 394 Pa. 406, 410, 147 A.2d 620 (1958), *citing, Seltzer v. Reading*, 151 Pa.Super 226, 30 A.2d 177 (1942), *Coble v. Metal Township School District*, 178 Pa.Super 301, 116 A.2d 113 (1955). Contemporary cases have uniformly held that the collateral source rule applies to prevent a tortfeasor from taking advantage of the fortuitous existence of collateral sources serving to ameliorate the harm caused by the wrong-doer. See, e.g., *Leeper v. U.S.*, 756 F.2d 300, 303 (3d Cir.1985); *Beechwoods Flying Service, Inc. v. Al Hamilton Contracting Corp.*, 504 Pa. 618, 476 A.2d 350 (1984). The fact that Main Line was engaged in other jobs after its bid to the Board was rejected is, therefore, irrelevant to the calculation of the measure of tort damages.

Also somewhat puzzling to the court is the Board's argument that the *stipulated* calculation of Main Line's profit is unsupported by the evidence. The purpose of entering into the stipulation was to remove from the adjudication of this matter all issues of fact. The Board makes no argument that its entry into the stipulation was

caused by fraud, accident or mistake. Without some foundation indicating that consent to the stipulation was faulty, we have no alternative but to hold the parties to their agreement.

We note, however, that in Stipulation No. 47, "profit" is not modified by words such as "gross" or "net". We find the use of the word "profit" in this context without such modification to be inherently ambiguous. Further, on the state of the record we are unable to determine just what the parties intended the word to mean. While the stipulation provides that Main Line "expected to realize" the stated profit, we find that these words are insufficient to resolve the ambiguity created by the omission. This is because the total of the subcontractor costs detailed in the depositions does not, when subtracted from Main Line's bid produce the stipulated amount. Neither does the record adequately demonstrate how other costs, such as overhead were figured into the calculation. Our order will, therefore, provide for further proceedings limited to this question.

Finally, pursuant to 42 U.S.C. § 1988, a prevailing party may, at the discretion of the district court, be awarded a reasonable attorney's fee. Our order will, therefore, also provide for the plaintiff to file a petition for the award of attorney's fees. We reserve judgment on whether such award would be proper in these circumstances until the parties have had the opportunity to fully brief the issue.

## IV. Conclusion.

In conclusion, we find that the plaintiffs have standing to bring this lawsuit, that the question presented is not moot, and that they are entitled to the declaratory relief they seek. As such we declare that the provisions of Addendum No. 1 (Revised) of the General Conditions of the Board's Specifications for Alterations and Improvements are violative of the Equal Protection Clause of the Fourteenth Amendment to the Constitution.